# ANDREWS *v.* NILSON.

PATENTS; INTERFERENCE; CLAIMS; BURDEN OF PROOF; PRESUMPTIONS; REDUCTION TO PRACTICE.

1. The junior party to an interference is not required to prove his case beyond a reasonable doubt, but need prove it only by a preponderance of the evidence, where his application was pending when a patent was granted to his adversary.

2. The presumption is that an inventor intends to protect his invention broadly, and consequently the scope of a claim should not be restricted beyond the ordinary meaning of the words, save for the purpose of saving it; and, in reading the claim for the purpose of construing it, heed must not only be paid to the specification proper and to the drawings, but also to the other claims of the patent.

3. Where a patent has been granted as filed, no prior art being cited, and the element in controversy in the interference is narrowly claimed in some of the claims and broadly in others; and where the application upon which the patent was issued was pending with the application with which it becomes involved in interference; and where no motion is made to avoid the interference by calling the attention of the Patent Office to the claimed fact that an element of the claim is limited to such element when made of a material having certain characteristics; and where the invention may be carried out by the use of the element with or without the limiting qualification,—the issue should be construed as it reads, and free from narrow encumbrances; and the senior party who has a patent may not be heard to ask that his claim be rewritten so that it may prevail in the interference.

4. The same acts or sets of acts may, or may not, constitute reduction to practice, modified as they may be by the special circumstances of the particular case. (Following *Gallagher* v. *Hien*, 25 App. D. C. 77.)

5. In an interference case, where there were tests of the device embodying the invention by men of experience in the particular art to which the invention related, at a place equipped with everything necessary to enable continued and complete tests to be made, it was *held* that there had been a reduction to practice, in that the test showed the work of the invention to be complete, though the first device so made was not a commercial article.

No. 320. Patent Appeals. Submitted March 14, 1906. Decided May 1, 1906.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference case. *Reversed.*

The facts are sufficiently stated in the opinion.

*Mr. Alexander D. Lunt* and *Mr Albert G. Davis* for the appellant.

*Mr. Clifton V. Edwards* for the appellee.

Mr. Justice DUELL delivered the opinion of the Court.

This appeal brings before us for review the correctness of

the decision of the Commissioner of Patents awarding priority of invention to Lars G. Nilson, the senior party, of the following issue:

"In an interrupter, the combination of an electro-magnet, a vibratory strip carrying a contact point, and a two-part armature mounted on said strip at opposite sides of the contact point."

The interference as originally declared was between two claims of a patent issued November 18, 1902, to Nilson, upon an application filed May 14, 1902. William S. Andrews's application, however, was filed June 5, 1902, three weeks after Nilson's and it was copending with that of Nilson, so that the rule invoked by the Examiner of Interferences in deciding that Andrews was under an obligation to prove his case beyond a reasonable doubt in order to prevail does not apply. Nilson's patent was irregularly issued, as both applications were pending at the same time; therefore the rule applicable is that which requires the junior party to an interference to prove his case only by a preponderance of evidence.

So far as the record discloses, neither party moved to dissolve the interference, but promptly proceeded to take their testimony, thereby recognizing that, in their opinion, there was an interference in fact. It appears, however, that after the testimony was taken, filed in the Patent Office, and printed, the Examiner of Interferences, under the provisions of Rule 126 of the Patent Office, notified the Commissioner that, in his opinion, Andrews had no right to make the claim which was the second count of the issue. The case being remanded to the primary examiner, who had declared the interference, he examined the question and reported that, in his opinion, Andrews had no right to make the claim. Apparently no appeal was taken from his decision, and therefore, in due course, the interference was dissolved as to that claim or count of the issue. Up to this time it does not appear that any question was raised as to the construction to be placed upon the first issue.

We have referred to this matter, as, in our opinion, it sheds light upon the question of the proper construction to be placed

upon the remaining issue. Both parties accepted that issue as it read, and neither the primary examiner, nor the Examiner of Interferences, up to the time of his decision awarding priority of invention to Nilson, had given to the issue any construction other than its terms naturally import.

In his decision awarding priority the Examiner of Interferences, however, invoking the rule that the issue must be construed in the light of Nilson's specification, because that issue is a claim copied from his irregularly issued patent, holds that the element—"a vibratory strip"—must be limited to one of nonmagnetic material, although the claim is for a combination where the vibratory strip has no such expressed limitation.

While we do not question that rule, which has often received our approval, we do question the correctness of its application to the case at bar. A claim is, as has been said, "not a nose of wax." While the courts are inclined to liberality in referring back to the specifications for limitations to be placed upon elements of a claim in order to save the claim from invalidity by reason of the prior art, they are not so inclined when the prior art does not require it, nor where an infringer insists that such limitations should be imposed in order to escape a charge of infringement; and this is especially so where the element sought to be limited is claimed broadly in one or more claims, and narrowly, and with such limitations, in others. The reasonable presumption is that an inventor intends to protect his invention broadly; and consequently the courts have often said that the scope of a claim should not be restricted beyond the fair and ordinary meaning of the words, save for the purpose of saving it. In reading a claim for the purpose of construing it, heed must not only be paid to the specification proper, and to the drawings, but also to the other claims of the patent. *Ryder* v. *Schlichter,* 61 C. C. A. 469, 126 Fed. 487.

Where, as in the present case, a patent has been granted as filed, no prior art being cited, and the element in controversy is narrowly claimed in some of the claims and broadly in others; and where the application upon which the patent was issued was pending with the application with which it becomes

involved in interference; and where no motion is made to avoid the interference by calling the attention of the Patent Office to the claimed fact that an element of the claim is limited to such element when made of a material having certain characteristics; and where the invention may be carried out by the use of the element with or without the limiting qualification,— no good reason is apparent why the issue should not be construed as it reads, and free from narrow encumbrances. The senior party who has a patent may not be heard to ask that his claim be rewritten so that he may prevail in an interference. He would be in somewhat better position had his patent not been issued, or had he surrendered it for reissue.

In our opinion the claim must be construed as broadly as Nilson made it, and as broadly as the state of the art apparently warrants.

The testimony will be considered and applied to the issue as having the scope its language gives to it.

Andrews, upon whom the burden rests, must prove by a preponderance of evidence that he disclosed the invention prior to July 11, 1901, the date Nilson has satisfactorily proved for his disclosure; and that he reduced the invention to practice prior to September 1, 1901, for Nilson's reduction to practice is shown to have been September 1, 1901. In his preliminary statement Andrews claims conception, disclosure, and reduction to practice between May 29, and June 30, 1901.

Andrews thus states the time and circumstances under which he conceived the invention: "I first used a vibrating strip composed of a metal strip with a divided iron armature early in the spring of 1901, and referred to the same in sundry letters to Mr. E. W. Rice which will fix the date of said invention. The circumstances which led up to the use of a double or divided armature were as follows: I was using a vibrator made of thin sheet steel, and found that the action of this vibrating member was not sufficiently steady to produce good results in controlling the voltage of a generator which was being experimented with. I then took up from the bench on which the vibrator was standing two ordinary iron washers and placed

them one on each side of the platinum connection point, thus forming a divided armature, and I found that this addition to the vibrating armature produced a marked effect in steadying the action of the instrument, thereby keeping the voltage steady."

Merrill, his assistant, corroborates him, stating that he distinctly remembers seeing Andrews place two iron washers on either side of the contact point, which was situated in front of the poles and carried on the flexible metallic ribbon, which latter was supported at either end by clamps which were fastened to posts by thread and nut.

Neither of the witnesses by their unaided memory is able to fix the exact date of this experiment, but there is in the record certain letters passing between Andrews and Rice, an officer of the General Electric Company, which enable Andrews to fix the date, and are of a sufficient corroborative character, when taken in connection with the testimony of Andrews and Merrill, to satisfy us that that which was done was of a date prior to July 11, 1901, and probably several days before July 6, 1901.

Another witness, Jackson, an employee of the General Electric Company, testified that, so far as he knew, Andrews devised the invention in controversy, and sets forth quite fully and clearly the sources of his knowledge and belief. He says: "In the early part of May, 1901, Mr. Andrews spoke to me of his invention, and proposed to me that I should take up the supervision of the construction of the apparatus and the testing thereof. The first regulator built under my supervision consisted mainly of a coil or magnet, a stationary binding post with a contact screw, and a piece of iron of about three sixteenths of an inch thickness, held opposite the center of the coil by one metallic post from one of its extremities; the next regulator built with any material bearing on this case had a thinner sheet or strip of iron substituted for the heavier piece used on the one made before, and was supported from both of its extremities with nuts and a thread for varying the tension. While this machine was under test it was found to operate more satisfactorily if some weight were added to the metallic strip. I saw

Mr. Andrews place two nails in the magnetic field of the coil on the ribbon, and this seemed to improve it. On this same machine running under practical conditions, it operated satisfactorily with iron washers placed on either side of the contact points. Mr. Andrews then informed me of his intention to have a regulator built containing these features permanently attached to the sheet strip. This was as far as I can remember in the latter part of June, and later I saw the machine he referred to under construction."

He further testifies that he saw the regulator in use in building 11 of the General Electric Company's works in June, 1901, and that he also saw in use in building 13 a similar regulator both before and after he went to Utica. He shows by his note book that he went to Utica July 22, 1901, and returned August 10, of the same year.

A careful reading of all of the testimony convinces us that a regulator, embodying the issue of the interference as it reads and as we think it should be read, was devised by appellant, Andrews, as early as June, 1901; was tested in the works of the General Electric Company of Schenectady as early as the first week of July, 1901; was found to be a practical device, notwithstanding that the iron washers of the interrupter were held in place by magnetic attraction and were concededly of a temporary character; and that it amounted to a reduction to practice.

*Loewer* v. *Ross,* C. D. 1896, P. 40, a case referred to by the Examiners-in-Chief, shows that the Patent Office has held that a material part of an apparatus may be separate from the apparatus and temporarily held up to its work, and yet constitute reduction to practice. As we said in *Gallagher* v. *Hien,* 25 App. D. C. 77: "The same act or sets of acts may or may not constitute a reduction to practice, modified, as they may be, by the special circumstances of the particular case." In the case at bar we think that the thorough tests, testified to as having been made at Schenectady, show that the work of the inventor was complete, and that, though the first regulator was not a commercial article, it was, under "the special circumstances of the

particular case," a sufficient embodiment of the completed invention. It was tested by men of experience in the particular art to which the invention related, and at a place equipped with everything necessary to enable continued and complete tests to be made. The construction and test of the first device was immediately followed up by the building of the interrupters known as "exhibits 4." In these the two parts of the armature were permanently attached to the vibratory strip. The testimony adduced on behalf of Andrews shows that an interrupter, the same as these exhibits, was put into use to regulate an electric generator prior to September 1, 1901, the date of Nilson's reduction to practice. That these exhibits embody a "two-part" armature is beyond question, and disposes of the objection raised by counsel for Nilson that there was no "two-part" armature in Andrews's first construction.

As we view it, the decision of the Commissioner of Patents awarding priority to Nilson was erroneous, and we are therefore compelled to and do reverse it.

The clerk of the court will certify this opinion, and the proceedings in this court in the premises, to the Commissioner of Patents according to law. *Reversed.*